UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| **Jeffrey Vales,**<br><br>          **Plaintiff,**<br><br>v.<br><br>**Capital One Services, LLC,**<br>**Capital One Financial Corporation, and**<br>**Capital One, National Association,**<br><br><br>          **Defendants.** | CIVIL ACTION NO. _____ |

**COMPLAINT**

Plaintiff Jeffrey Vales ("Plaintiff" or "Vales") respectfully moves for judgment against Defendants Capital One Services, LLC, Capital One Financial Corporation and Capital One, National Association, (collectively "Capital One" or "Defendants"):

**Introduction**

1. This is a claim for relief pursuant to Older Workers Benefits Protection Act (OWBPA), and subject to this Court's ruling on the OWBPA claim, should Plaintiff prevail on such claim, then Plaintiff asserts a corresponding claim under the Age Discrimination in Employment Act (ADEA). Plaintiff was employed by Capital One, and upon his termination signed a "Letter of Agreement" purporting to release his claims under ADEA. Plaintiff alleges that he was terminated pursuant to an employment termination program and that the Letter of Agreement failed to comply with the OWBPA requirement of 45-day consideration period and a listing of names and job titles of others affected by the program. Plaintiff is entitled to keep his

1

severance payment and sue Capital One for age discrimination. *Oubre v. Entergy Operations*, 522 U.S. 422 (1998). Plaintiff may sue for an OWBPA violation. *Krane v. Capital One*, 314 F. Supp. 2d 589 (E.D.Va. 2004) (Payne, J.). In conjunction with a Court determination that the Letter of Agreement did not comply with OWBPA and, conditioned on such finding, plaintiff seeks relief for age discrimination under ADEA.

2. Although Plaintiff intended to bring this as a collective action under 29 U.S.C. § 216(b), the Court's decision on June 8, 2020 in *Hutchens v. Capital One Services, LLC, et al.*, Case No. 19-cv-546 precludes such an action because the identical "Letter of Agreement" that Plaintiff signed was at issue in *Hutchens* for which this Court held that plaintiff could not proceed collectively. If this Court or a higher Court ultimately reverses the *Hutchens* holding and allows a collective action to proceed, then Plaintiff will join with the plaintiff in *Hutchens* and other similar cases in order to proceed collectively against Defendants, and Plaintiff reserves the right to amend this Complaint accordingly.

## Jurisdiction and Venue

3. This Court has jurisdiction for his ADEA claims pursuant to 29 U.S.C. § 216(b) as incorporated by 29 U.S.C. § 626(b), and under 29 U.S.C. § 626(c), in that the Plaintiff may bring this action in any appropriate United States District Court.

4. Venue is proper for this Court pursuant to 28 U.S.C. § 1391 and Local Rule 3(B)(4) since the acts and omissions giving rise to this lawsuit have taken place in the Eastern District of Virginia.

5. Defendants are subject to personal jurisdiction in the Commonwealth of Virginia.

## Parties

6. Vales is a resident of Virginia who was employed by Capital One most recently as

a Senior Business Manager.  Plaintiff was an "employee" as defined in the ADEA.

7. Capital One Services, LLC is a Virginia limited liability company, which has its principal office in Virginia.

8. Capital One Financial Corporation is a foreign corporation, which has its principal office in Virginia.

9. Capital One, National Association is a foreign corporation, which has its principal office in Virginia.

10. On information and belief, the Defendants are related entities in the financial products and services industry. According to filings with the Virginia State Corporation Commission, the Defendants list their principal office as being located at 1680 Capital One Drive, McLean, Virginia 22102 and share the same registered agent.  Plaintiff is currently unable to determine the precise corporate structure and relationship between Defendants.  Defendants are an "employer" as defined by the ADEA.

## Factual Allegations

11. Vales was hired by Capital One in 1999.

12. Vales worked from Capital One's West Creek office complex in Goochland County, Virginia.

13. During the time frame relevant to this lawsuit, Vales worked as a Senior Business Manager in the Anti-Money Laundering ("AML") Department for Capital One and was age 57.

## Performance Management

14. Capital One has five categories for its performance evaluation ratings scale: Exceptional, Very Strong, Strong, Inconsistent, Action Required.

15. Capital One informally refers to the five categories as five "buckets."

16. During Vales' employment with Capital One (age 38 to 57) he consistently received performance evaluations in the Strong, Very Strong, or Exceptional buckets. Vales never received a poor performance evaluation at Capital One.

## Policy to Increase "Involuntary Attrition"

17. Capital One claims to hire the best and brightest associates available. For example, Chief Information Officer Rob Alexander stated in a blog post on July 19, 2017 that Capital One has a "best people philosophy," which involves hiring the "best talent in the industry."

18. During the relevant time period, Capital One implemented personnel policies that:

   a. Sought to increase Capital One's "involuntary attrition" rate of employees, that is, terminations based on alleged poor performance or job elimination; and

   b. Prohibited employees rated "Inconsistent" from finding other roles within Capital One (the "No-Transfer" policy).

19. The No-Transfer policy that went into effect was that any employee rated "Inconsistent" was prohibited from transferring to another role within Capital One without special dispensation from a VP-level executive. Individual discretion of managers to accept transfers of employees rated "Inconsistent" was prohibited. Previously employees rated "Inconsistent" were allowed and encouraged to find other roles within Capital One, and the hiring managers had wide discretion to approve such transfers.

20. The most significant change in Capital One policy was that it intentionally sought to increase its rate of "involuntary" terminations.

21. Capital One tracks percentages of "involuntary" terminations, also known within Capital One as "involuntary attrition."

22. At Capital One, "involuntary attrition" refers generally to terminations that are "involuntary" to the employee, namely (1) performance-based terminations, and (2) job eliminations (known within Capital One as "restructuring").

23. Upon information and belief, Capital One required its managers to involuntarily terminate a set percentage of its employees across all business units.

24. The policy requirement to meet specific "involuntary attrition" targets was set by the highest executives within Capital One.

25. "Performance Management" was the primary means by which this central policy of increasing "involuntary attrition" rates was implemented.

26. At Capital One the term "distribution" means the range of performance ratings set for each "bucket" of performance. Previously the "distribution" percentages set for each "bucket" was aspirational. During the relevant time period of this lawsuit, Capital One's "distribution" percentages were mandatory.

27. This "Performance Management" policy of forcing managers to rank a fixed percentage of employees as poor performers was informally called "forced rankings" or "forced distribution" by Capital One employees.

28. Under the guise of "Performance Management," the Executive Committee (EC) members, (the highest echelon of executive leadership at Capital One), determined the specific forced "distribution" percentages for their managers to meet regarding what fixed percentage of employees were to end up in each of the performance "buckets" applicable to that EC's line of business.

29. From the bottom two "buckets," employees were placed on "coaching plans" or "performance improvement plans" ("PIPs").

30. Employees who, through "Performance Management" were forced into the bottom two buckets or placed on "coaching plans" and "PIPs," were the pool from which managers they would identify the ultimate target of "involuntary" terminations.

31. In addition to "Performance Management," Capital One engaged in some restructuring in the form of job eliminations which also counted towards its targeted increase of its "involuntary attrition" rate.

32. Elsewhere in the private sector, where an employer requires a set percentage of employees to be ranked as poor performers, this practice is commonly called "stack rankings." (*See, e.g.* Amazon to Drop Dreaded Stack-Ranking Performance Reviews, *Seattle Times*, Nov. 14, 2016; Microsoft Gets Rid of Stack-Ranking Review System, *Seattle Times*, Nov. 12, 2013).

33. The problem with stack rankings is that employees who are objectively meeting all performance expectations are falsely rated as poor performers.

34. Falsely giving good employees poor performance evaluations became Capital One's standard operating procedure under its "Performance Management" policy.

35. The Requirement that fixed percentage of employees be rated as poor performers, with a subset therein being terminated "involuntarily," led to objectively well-performing employees being issued poor performance evaluations, coaching plans, and PIPs, and ultimately terminated.

36. Although performance evaluations, coaching plans, PIPs, and terminations were issued directly to individual employees, it was all done as part of an overall policy implemented by Capital One to increase "involuntary attrition" rates across all lines of business.

37. Through "involuntary attrition" of current employees, Capital One was making room for younger employees pursuant to a marketing, recruiting, and hiring campaign to attract

recent college graduates.

38.     "Our No. 1 principle is to attract really talented people," [Capital One VP of Human Resources Judy] Pahren says. "We know our success is dependent on talent." Recruiting younger workers like millennials, she adds, "is key to that strategy." *See* Virginia Business Magazine, The Rise of Millennials, November 2019.[1]

39.     Capital One's effort to higher younger workers came through its Campus Recruiting Program ("CRP"), which focused on hiring only recent college graduates. Within the past two years the CRP has been open only to college graduates in classes 2017 to 2020. Based on the general age of college graduates between the years of 2017 and 2020, Capital One has essentially set its hiring criteria to candidates in their early to mid-20s.

## Termination of Vales

40.     Capital One's termination of Vales did not arise out of individual circumstances. It was a result of Capital One's mandate requiring managers to increase "involuntary attrition."

41.     On or about October 31, 2018, Vales sought and received a verbal offer for a job transfer.

42.     On or about November 1, 2018, Vales was told that his then-current position was being eliminated effective January 2, 2019.

43.     At Capital One a job elimination is called "Restructuring." Following a Restructuring announcement, employees are given a 60-day period, called "Redeployment," to find employment elsewhere within Capital One.

44.     Based on Vales' receipt of verbal confirmation of his job transfer, he anticipated that such transfer would go through during his "Redeployment" period.

---

[1] Available at https://www.virginiabusiness.com/article/the-rise-of-the-millennials/ (last accessed Dec. 4, 2020).

45. Capital One's prior policy was that job transfers were generally permitted and approved during Redeployment. Following Capital One's policy to increase involuntary attrition it amended its Redeployment policy to prohibit any employee "with documented performance issues…an Inconsistent year-end rating, an active Performance Improvement Plan (PIP) and/or Conduct Memo" from even applying for a transfer within Capital One. (The quoted language is from Vales' redeployment Memo dated November 1, 2018 and reissued January 3, 2019).

46. In other words, the "No-Transfer" policy set forth above was extended to those transfers sought during the Redeployment period.

47. However, Vales had never received any documented performance issues, "Inconsistent" performance review, PIP, nor a "Conduct Memo" in his entire career at Capital One. Therefore, based on written Capital One policy, Vales was eligible and entitled to transfer to another job during his "Redeployment."

48. On or about December 17, 2018, Vales verbally accepted the job transfer he was offered in October. The hiring manager verbally told Vales it was a done deal.

49. On or about December 27, 2018 the job transfer offer was verbally rescinded based on his then-current manager providing, for the first time, negative performance feedback about Vales.

50. Vales disputes that he was a poor performer. Years of prior performance evaluation ratings at Exceptional, Very Strong, and Strong levels contradicts Capital One's claim that Vales was a poor performer.

51. No negative performance review or feedback was ever provided to Vales by his manager before or after accepting the transfer offer.

52. Capital One asserted that because of its newly implemented "No-Transfer" policy,

the negative feedback that Vales' manager provided about him prevented him from transferring to the other job with Capital One.

53. Again, under the terms of Capital One's No-Transfer policy, only employees rated "Inconsistent," on a PIP, or a "Conduct Memo" are prevented from transferring. Vales most recent performance evaluation was "Strong." Since Vales was not, and had never been rated "Inconsistent," placed on a PIP, or issued a "Conduct Memo," he should not have been prohibited from transferring to another position within Capital One.

54. Capital One disregarded its own No-Transfer policy as it applied to Vales in order to carry out its policy of increasing "involuntary attrition," which latter policy was furthered by terminating Vales rather than allowing him to transfer.

55. Vales' employment with Capital One was terminated effective January 19, 2019.

56. After Capital One terminated Vales' employment he was replaced in his role by Thomas Threadgold who is approximately 14 years younger in age.

57. Capital One's process and policy of increasing involuntary attrition in the manner set forth herein (through "performance management" and job eliminations), is a facially neutral policy that has a disparate impact on employees over age 40 across all lines of business at Capital One.

58. Such policy is an employment termination program under the OWBPA that affects two or more employees.

59. Upon termination of Vales, Defendants provided, and Vales signed, a Letter of Agreement ("Agreement") which provided his severance pay in exchange for waiving certain claims against Defendants. Capital One has a copy of this Agreement which is substantially similar to the Agreement in *Hutchens v. Capital One*, Case No. 3:19-cv-546 (ECF No. 1-1).

60. The severance "Agreement" provided to Vales under the Capital One Severance Plan was called the "Restructuring Benefit Structure," a far greater amount than the "Performance Benefit Structure" which Capital One gives to associates terminated for alleged poor performance. This is further evidence that Vales was not a poor performer, and that he never was issued "Inconsistent" performance evaluation at Capital One.

61. Upon termination of Vales and other affected employees, Capital One failed to comply with the OWBPA requirement that affected employees be given 45 days to consider the release, and that ages and job titles of associates be provided.

62. Capital One did not provide 45 days, nor the statistical data of ages and job titles of other employees as required by OWBPA.

## Count 1 – OWBPA

63. OWBPA claims may not be released.

64. ADEA claims may not be released unless they comply with the OWBPA.

65. Capital One's Letter of Agreement did not comply with OWBPA.

66. The policy alleged herein was an "employment termination program" affecting two or more employees.

67. The Agreement provided to Plaintiff and others did not provide 45 days to consider the waiver of any rights or claims under the ADEA.

68. The Agreement provided to Plaintiff and others did not provide the job titles and ages of all individuals selected or not selected for termination under such policy alleged herein.

69. The Agreement was not a "knowing and voluntary" waiver of Plaintiff's rights and claims under the ADEA.

70. Plaintiff is entitled to declaratory, equitable, and/or injunctive relief based on

Capital One's OWBPA violation including but not limited to: age and job title data across the applicable line(s) of business, data reflecting "involuntary attrition" rates, other statistical data relating to these claims; an order declaring Capital One in violation of OWBPA and permitting Plaintiff to proceed with his claim under the ADEA, without retaliation and without being in breach of the Letter of Agreement; an award of attorneys' fees and costs; and other equitable, injunctive, and/or declaratory relief requested below.

71. The party asserting the validity of an OWBPA waiver has burden of proof that it was "knowing and voluntary." 29 USC § 626(f)(3).

72. Capital One cannot prove that the Agreement was knowing and voluntary.

### Count 2 – ADEA

73. Capital One discriminated against Vales because of his age, 57.

74. Capital One characterized Vales' termination as a part of a "restructuring."

75. The characterization is pretextual and false because a younger employee assumed Vales' role at Capital One.

76. But for Vales' age, he would not have been the subject of negative feedback, been denied an internal transfer, and been selected for termination from employment.

77. Capital One disparately treated Vales and other older associates, and treated younger employees more favorably, in the forced ranking and termination of older employees.

78. Capital One's disparate treatment of Plaintiff and older employees was willful.

79. Capital One's policies also had a disparate impact on older employees. Specifically, Capital One's policy to increase the rate and percentage of "involuntary attrition," which was implemented through a "performance management" policy which required forced or "stack" rankings to create a pool from which "involuntary" terminations were implemented, was

the standard operating procedure at Capital One. This policy had a disparate impact on Capital One employees over age 40. The average age of Capital One employees was reduced as older employees were replaced, in "headcount," by newer hires, many of whom were in their early to mid-20's including CRP hires.

80. Vales was disparately impacted because of his age by Capital One's policies which resulted in his termination.

81. Capital One implemented such discriminatory policy willfully, or showed reckless disregard for the rights of Capital One's employees over 40.

### Relief Requested for OWBPA

Wherefore, Plaintiff requests the Court grant the following Relief:

    A. Issuance of an Order finding that Capital One did not comply with the OWBPA;

    B. Declaring that Capital One's policy, as alleged herein, was an "employment termination program" under OWBPA;

    C. Declaring that the "Letter of Agreement" does not comply with the OWBPA, that the waiver contained therein was not "knowing and voluntary," and that Plaintiff may proceed with his ADEA claim;

    D. An Order directing Capital One to comply with OWBPA, including producing the ages and job titles of employees who were selected and /or non-selected for termination under the policy alleged herein, which should have produced under OWBPA;

    E. An Order directing that notice be delivered to all Capital One employees involuntarily terminated under the policy alleged herein, who signed a Letter of Agreement, informing them that their waivers are invalid and that those employees may

have ADEA claims;

  F. attorneys' fees; and

  G. any and all further relief permissible by law.

### ADEA Relief Requested

Wherefore, Plaintiff requests the following Relief against Defendants:

  A. Court order requiring Capital One to provide statistical data relating to employees and ages, involuntary attrition rates, headcount, performance management calibrations, forced rankings, involuntary terminations, new hires, and any other employment data relevant to Plaintiff's disparate impact claim;

  B. money damages suffered by Plaintiff as a result of Capital One's age discrimination of Plaintiff, including but not limited to lost pay, benefits, and if the Plaintiff received Capital One's "Performance Benefit Structure" severance, then the difference in severance benefits between that which Plaintiff received, and the greater sum of the "Restructuring Benefit Structure" which Plaintiff should have received as a result of the policy alleged herein;

  C. liquidated damages in an amount equal to all money damages suffered by Plaintiff as a result of Capital One's willful violation of the ADEA;

  D. pre-judgment and post-judgment interest;

  E. reasonable attorney's fees and costs expended in the prosecution of this case;

  F. any and all further relief permissible by law.

Plaintiff respectfully demands **TRIAL BY JURY** for all factual questions at issue in this case.

Respectfully submitted,
**Jeffrey Vales**
Plaintiff


By:\_\_\_\_/s/_____
      Craig Juraj Curwood (VSB No. 43975)
      Curwood Law Firm, PLC
      530 E. Main Street, Suite 710
      Richmond, VA 23219
      Telephone: (804) 788-0808
      Fax: (804) 767-6777
      Email: ccurwood@curwoodlaw.com

      and

      Harris D. Butler, III (VSB No. 26483)
      Paul M. Falabella (VSB No. 81199)
      BUTLER ROYALS, PLC
      140 Virginia Street, Suite 302
      Richmond, VA 23219
      Telephone: (804) 648-4848
      Facsimile: (804) 237-0413
      Email: harris.butler@butlerroyals.com
      paul.falabella@butlerroyals.com

      *Attorneys for Plaintiff*